Elizabeth TURPIN, Petitioner–
Appellee, Cross–Appellant,

v.

Betty KASSULKE, Warden, Respondent–
Appellant, Cross–Appellee.

Nos. 93–5529, 93–5663.

United States Court of Appeals,
Sixth Circuit.

Argued March 4, 1994.

Decided June 23, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 24, 1994.

Rodney McDaniel (argued and briefed), Frankfort, KY, for Elizabeth Turpin.

Todd D. Ferguson (argued and briefed), Chris Gorman, Atty. Gen., Frankfort, KY, for Betty Kassulke.

Before: KENNEDY and GUY, Circuit Judges; and FEIKENS, Senior District Judge.*

RALPH B. GUY, Jr., Circuit Judge, delivered the opinion of the court, in which KENNEDY, Circuit Judge, joined. FEIKENS, Senior District Judge (pp. 1402–17), delivered a separate opinion concurring in part and dissenting in part.

GUY, RALPH B., Jr., Circuit Judge.

Warden Betty Kassulke appeals the grant to petitioner Elizabeth Turpin ("Turpin") of a writ of habeas corpus. The district court found that the denial of Turpin's severance motion and the admission of certain writings into evidence rendered her state court trial fundamentally unfair. Turpin cross-appeals the district court's decision that her four other arguments for habeas corpus relief are without merit. We find that Turpin is not entitled to habeas corpus relief, and reverse the district court's grant of the writ.

## I.

During the latter half of January 1986, Elizabeth Turpin and Karen Brown visited a Lexington, Kentucky, area bar in the compa-

* The Honorable John Feikens, United States District Court for the Eastern District of Michigan, sitting by designation.

ny of Anthony Basham and Doug Elliot. Basham drove the group home from the bar, and during the drive Turpin remarked to Brown that her husband, Michael Turpin, had obtained a large insurance policy and that she "wouldn't want to be worth that much dead to someone." (App. at 322.) Turpin then stated, "kind of . . . in a joking manner," that she and Brown could "bump off" Michael to "get the money" from his life insurance policy. (App. at 323.) Brown took Turpin's statement seriously, and replied that she "kn[e]w somebody that could do it if you wanted him to[.]" (App. at 323.) Brown stated several times, however, that she would only approach this person if Turpin asked her to do so. (App. at 324.)

Shortly thereafter, Brown approached Keith Bouchard and offered him several thousand dollars to murder Michael. (Tr. Vol. XII, p. 71.) Bouchard was receptive to this proposal.

On the night of February 2, 1986, Bouchard, Brown, and Turpin drove Turpin's car to another bar in the Lexington area. Upon exiting the bar later that night, Turpin and Brown discovered that Turpin's car had been moved to a parking spot other than the parking spot in which they had parked it. Since Michael was the only person besides Turpin to have a key to the vehicle, Turpin surmised that Michael was the person who had moved it. This realization greatly upset both Turpin and Brown. Brown was so agitated that she told Bouchard, with whom she had recently ingested cocaine, that they "need[ed] to get rid of Mike" that night. (App. at 293.) Turpin felt the same way, as she said to Bouchard, "I don't care how you do it; I just want to get—get it over with." (App. at 294.)

The trio thereafter returned to Brown's apartment, where they discussed different ways of committing the murder. Using a firearm was not a possibility, because they had already tried and failed to obtain a gun that night. (App. at 295.) Brown proposed "rigging up" a car bomb to Michael's car, but

Bouchard replied that it was "too late for that." (App. at 297.) Turpin then found a corkscrew and suggested that they use it as the murder weapon, but Bouchard said that a corkscrew injury would "just make [Michael] mad." (App. at 297.) The trio next considered a plan according to which Turpin would carry on a "normal conversation" with Michael while Bouchard walked behind Michael and slit his throat. (App. at 299.) This plan also was discarded, though, because Turpin said she "probably couldn't handle doing it." (App. at 299.) The trio nevertheless continued to discuss the possibility of using "knives" to murder Michael. (App. at 299.) When Bouchard asked Turpin how he and Brown would be able to enter Turpin's apartment to commit the murder, Turpin gave them her key to it. (App. at 299.) Before leaving Brown's apartment with Brown, Bouchard asked Turpin, "[I]s this what you want"? (App. at 300.) Turpin responded by nodding her head. (App. at 300.)

Bouchard and Brown thereafter armed themselves with knives and proceeded to Turpin's apartment. Michael answered their knock at his door and allowed the pair to enter. As Brown began to feign concern about whether Turpin had arrived home safely that night, Bouchard lunged at Michael and began stabbing him in the face and throat. A struggle ensued and, at one point, Brown held Michael down and covered his mouth while Bouchard continued to stab him. (App. at 308–09.) After Michael died, the pair returned to Brown's apartment. There they met Turpin, who asked them whether "it [was] over with." (App. at 320.) Bouchard, who was covered with Michael's blood, simply replied, "[L]ook what your husband did to me[.]" (App. at 320.) [1]

A jury later found Turpin and Brown guilty of capital murder after their joint trial in Kentucky state court. Turpin and Brown each were sentenced to life imprisonment without parole eligibility for 25 years. Bouchard pled guilty to capital murder and testified for the prosecution during the joint trial.

**1.** At trial, Turpin's version of the facts differed sharply from that presented by other witnesses. Since we review Turpin's case in the context of a habeas corpus proceeding, however, we have credited the version of the facts most favorable to the prosecution. *See Jackson v. Virginia,* 443 U.S. 307, 326, 99 S.Ct. 2781, 2793, 61 L.Ed.2d 560 (1979).

Turpin appealed to the Supreme Court of Kentucky, which affirmed her conviction.

Turpin thereafter filed a petition for federal habeas corpus relief, in which she presented six possible grounds for the relief sought. In response, the Commonwealth of Kentucky filed a motion for summary judgment. Turpin's petition was referred to a magistrate judge, who recommended that the district court grant the Commonwealth's motion and dismiss Turpin's petition with prejudice. After Turpin filed objections to this recommendation, the district court rejected the recommendation in part and granted Turpin's petition for a writ of habeas corpus. These appeals followed.

## II.

We review de novo the district court's decision to grant Turpin's petition for habeas corpus relief under 28 U.S.C. § 2254. *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1350 (6th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1317, 127 L.Ed.2d 666 (1994). The first of Turpin's two arguments that the district court accepted is that the trial judge's denial of her severance motion violated her due process rights. During her joint trial, the prosecution played for the jury a tape of Brown's statement to a police interrogator. The trial judge excluded, however, that portion of the tape which came after Brown told the interrogator she wanted a lawyer. Turpin asserts that the excluded portion of the tape is exculpatory as to her. Since this portion of the tape conceivably might not have been excluded if Turpin had been tried alone, Turpin maintains that the denial of her severance motion violated her fundamental right to present evidence in her own defense.[2]

In considering this argument, the magistrate judge and district court looked to cases that addressed the issue of whether the denial of a severance motion was an abuse of discretion that deprived a defendant of his due process rights. As a general matter, however, severance cases focus either on antagonistic defense claims, *see, e.g., Jenkins v. Bordenkircher,* 611 F.2d 162 (6th Cir.1979), *cert. denied,* 446 U.S. 943, 100 S.Ct. 2169, 64 L.Ed.2d 798 (1980), or on an asserted need for codefendant testimony, *see, e.g., Tifford v. Wainwright,* 588 F.2d 954 (5th Cir.1979). Antagonistic defense claims present issues that are clearly distinct from those raised here. Similarly, the analysis used in the codefendant testimony cases is shaped by the need to determine whether the codefendant in fact would testify in a separate trial and, if so, what the precise nature of that testimony would be. *See, e.g., Byrd v. Wainwright,* 428 F.2d 1017, 1020–21 (5th Cir.1970). Here, in contrast, the denial of Turpin's severance motion effectively excluded from her trial a known, discrete item of evidence—the suppressed portion of Brown's statement.[3] Turpin's argument therefore is better analyzed under the cases that have considered due process challenges to state court rulings that excluded an item of evidence proffered by a criminal defendant.

These cases rest upon the proposition that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi,* 410

---

**2.** Turpin's main contention in support of her severance motion was that a joint trial would present "too many" complicated issues "for one jury to deal with in one proceeding." (App. at 282.) She also asserted, though, that a joint trial would needlessly present "questions in regard to the use of co-defendants' implicatory statements against one another [and] Fifth Amendment rights to silence[.]" (App. at 282.)

**3.** Turpin's argument on the severance issue, as set forth in her brief in this court, focused entirely on the exclusion of Brown's statement, not on the fact that Brown was able to invoke her privilege against self-incrimination during the joint trial. Turpin's brief mentions the possibility of

Brown's testifying at a later trial only to bolster her contention that Brown's *statement* would be admissible in such a trial. *See* Petitioner's Brief at 15 ("Turpin could call Brown as a witness at a separate trial and should the substance of her testimony differ from her statement to the police, the statement could then be offered to impeach her."). Turpin's focus on Brown's statement is understandable, for, as her attorney conceded during oral argument, she can only guess as to whether Brown in fact would choose to testify in a separate trial of Turpin. Thus, the dissent's emphasis on the possibility of Brown's testifying at a later trial shifts the focus away from what Turpin actually argues before this court to a far more speculative issue.

U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). We have recognized that this right includes within it the right of a criminal defendant "to present evidence on his behalf[.]" *Allen v. Morris,* 845 F.2d 610, 615 (6th Cir.1988), *cert. denied,* 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). The right to defend one's self against the state's accusations is not absolute, however, "and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers,* 410 U.S. at 295, 93 S.Ct. at 1046.

The Supreme Court looks to several factors in determining whether a defendant's due process rights require the admission of a particular item of evidence. First, the Court considers the extent to which the proffered evidence is "critical" in the context of the case. *Id.* at 302, 93 S.Ct. at 1049. Second, the Court considers the extent to which the proffered evidence "tend[s] to exculpate" the accused. *Id.* at 297, 93 S.Ct. at 1046–47. Finally, the Court determines whether the proffered evidence bears "persuasive assurances of trustworthiness[.]" *Id.* at 302, 93 S.Ct. at 1049.[4]

In *Chambers,* the Court considered these factors in the course of addressing an issue very similar to that presented here. The defendant in *Chambers* was accused of shooting a police officer. At trial, Chambers called to the witness stand one McDonald, who had confessed to the murder on three separate occasions shortly after it was committed. While McDonald was on the stand, Chambers elicited the fact that McDonald had confessed to the crime charged. McDonald had recanted his confessions prior to trial, however, and the state highlighted this fact during its "cross" examination of him. In response, Chambers sought to re-examine

McDonald as an adverse witness, but the trial judge refused to let him do so.

Chambers then sought to admit the testimony of the three persons to whom McDonald had confessed. The first of these witnesses, Sam Hardin, took the stand, and in the presence of the jury told the story of McDonald's confession to him. When the state objected to this testimony on hearsay grounds, the trial judge sustained the objection and ordered the jury to disregard Hardin's testimony. Chambers next called Berkley Turner to testify. The jury was excused and Turner related the particulars of McDonald's confession to him. The state again objected on hearsay grounds and was sustained. Finally, Chambers called Albert Carter to the stand. Outside of the presence of the jury, he too told the tale of McDonald's confession to him, but the state objected once more on hearsay grounds and was sustained.

The Supreme Court held that the exclusion of all this testimony, when "coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." *Id.* at 302, 93 S.Ct. at 1049. The Court's reasoning focused on the excluded testimony of the three witnesses, which was clearly exculpatory and "critical to Chambers' defense." *Id.* The core of the Court's reasoning concerned the reliability of the excluded testimony. The Court noted that "each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder occurred"; that "each [confession] was corroborated by some other evidence in the case"; and that the rationale for the penal-interest exception to the hearsay rule squarely applied to the confessions. *Id.* at 300–01, 93 S.Ct. at 1048–49.[5]

---

4. The dissent cites language from a related line of cases, which "might loosely be called the area of constitutionally guaranteed access to evidence[.]" *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). These cases—which include, for example, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (due process rights violated by suppression of evidence by prosecution)—couch their analysis in terms of whether the evidence at issue is "vital," *Washington v. Texas,* 388 U.S. 14, 16, 87 S.Ct. 1920, 1922, 18 L.Ed.2d 1019 (1967), or "might have affected the outcome of the trial." *United*

States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). Unlike this case and *Chambers,* however, the "access to evidence" cases do not concern the exclusion of a known, discrete item of evidence. We therefore hew closely to the analysis used in *Chambers* as we consider Turpin's argument.

5. At the time of Chambers' trial, Mississippi had not adopted the penal-interest exception to the hearsay rule. *See Chambers,* 410 U.S. at 300 n. 20, 93 S.Ct. at 1048 n. 20.

The Court accordingly concluded that "[t]he hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300, 93 S.Ct. at 1048.

The facts here differ materially from those set forth in *Chambers*. There is of course no question that the excluded portion of Brown's statement pertained to critical issues in Turpin's trial. Unlike the witnesses' testimony in *Chambers*, however, the excluded portion of Brown's statement was of dubious exculpatory value and bore considerable indicia of *un*reliability.

A careful review of the excluded portion of Brown's statement belies Turpin's claim that it clearly exculpates her.[6] She points out that, in the excluded portion of Brown's statement, Brown asserted that Turpin did not think Bouchard and Brown would actually kill her husband and that Turpin "never did say kill him." Brown also stated, however, that (1) on the night of the murder, Turpin was the first person to mention the idea of killing her husband;[7] (2) shortly before the murder, Turpin discussed with Brown and Bouchard the possibility of killing her husband that night;[8] and (3) although Turpin knew that Bouchard and Brown were going to Turpin's apartment when they left to commit the murder, she did not try to stop the pair, but instead told Bouchard to "do whatever you've got to do[.]" (App. at 251.) Given these remarks, Brown's statement inculpates Turpin as much as it exculpates her.

We note that the conduct of the parties at the time of the trial judge's decision indicates that they shared our view of the nature of the excluded portion of Brown's statement. As Turpin's attorney acknowledged at oral argument, the *Commonwealth*, not Turpin, sought admission of Brown's statement at trial. Moreover, although Turpin's severance motion was filed 10 days after the trial judge decided to suppress the excluded portion of Brown's statement, Turpin's brief in support of her motion nowhere mentioned the trial judge's suppression ruling, and indeed did not specifically mention Brown's statement. (*See* app. at 275–82.)

We next examine the extent to which Brown's statement is worthy of trust. It is true that the statement was among the items of evidence relied upon by the Commonwealth in its attempt to have the death penalty imposed upon Brown. Such reliance can be an important indicia of reliability. *See Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979).[9] For the reasons that follow, however, we think that Brown's statement is fundamentally untrustworthy.

The unreliability of Brown's statement is highlighted when the statement is contrasted with the testimony that was excluded in *Chambers*. First, and admittedly of lesser significance, is the fact that Brown's statement was made to a police interrogator and was not a spontaneous utterance to a close acquaintance. Second, the critical portions of Brown's statement were "corroborated"

---

6. We emphasize that, in considering whether the excluded portion of Brown's statement clearly exculpates Turpin, we regard the *whole* of the excluded portion of the statement, not merely those snippets that Turpin maintains are exculpatory as to her; for, as Turpin acknowledges, if she had been tried separately and the statement had been deemed admissible in her separate trial, it would have been admitted *in toto*.

7. Towards the beginning of the excluded portion of her statement, Brown stated:

I don't know whether Liz was serious or not, but she made the statement, which shouldn't have been a joking statement, that she said, "Well, we should kill him". I mean she said it in a joking manner, but that's not a joking

statement and Keith took her seriously Liz was drunk, she was drunk.
(App. at 245.)

8. The excluded portion of Brown's statement contained the following exchange:

Gibbons [police interrogator]: And the three of you got to talking about killing Mike?
Brown: Uh huh (indicated yes).
Gibbons: Is that right?
Brown: Yeah.
(App. at 250.)

9. Although we have no occasion here to comment upon the propriety of Kentucky's reliance upon Brown's statement in its pursuit of a death sentence for her, we note that Brown in fact was not sentenced to death.

only by Turpin's own self-serving testimony at trial.[10]

Most important, although Brown's statement arguably was against her penal interest, a reading of the statement as a whole reveals that Brown's purpose in making the statement was to *avoid* criminal liability to the extent possible, not to accept it.[11] Brown's story changed dramatically over the course of her interrogation, as she sought to escape criminal liability. Near the outset of her interrogation, Brown flatly stated, "I can sit and look you honestly in the eye and tell you I don't know who killed [Michael Turpin]." (App. at 190.) Later, Brown admitted to spending the night of the murder with Turpin and Bouchard, but asserted that they had not left Brown's apartment after they returned from a local bar. (App. at 211–12.) When Brown was told that Bouchard was being questioned, however, she stated that she had accompanied Bouchard to the murder scene and that she had seen Bouchard stab Michael to death. She nevertheless insisted that Bouchard had instigated Michael's murder and that she had tried to dissuade Bouchard from committing the crime. (App. at 250, 254.) Thus, Brown's statement plainly is rife with fabrications that she hoped would minimize her criminal liability. The rationale supporting the hearsay rule's penal-interest exception—that persons generally "will not make damaging statements against themselves unless they are true[,]" *United*

States v. Tovar, 687 F.2d 1210, 1213 (8th Cir.1982)—therefore does not apply to Brown's statement. *Cf. Rivera v. Director, Dep't of Corrections,* 915 F.2d 280, 281–82 (7th Cir.1990) (defendant Rivera's due process rights violated by exclusion of codefendant Norman's confession that "he [Norman] alone" committed crime charged, when confession was excluded for no "better reason than that it [was] hearsay.")

The dissent undoubtedly feels that the trial judge would have been wiser simply to let a jury determine the exculpatory value and reliability of Brown's statement. On that point the dissent may be right, and that fact might have been sufficient to carry the day if in this case we were exercising our supervisory powers over a federal court. But we exercise a more limited power here. Turpin was convicted in Kentucky state court, so the issue before us is not whether it would have been wiser to have granted Turpin's severance motion, but whether the trial's judge's failure to do so violated the minimal requirements of the Fourteenth Amendment's Due Process Clause. That clause does not compel the admission of evidence that is unreliable and of questionable exculpatory value.

### III.

The district court also accepted Turpin's argument that her due process rights were violated by the admission of both an excerpt

---

**10.** Throughout the trial, the government attempted to characterize Turpin and Brown as lovers, a characterization denied by Turpin. Regardless of the precise nature of their relationship, it is clear that they were very close friends.

**11.** We note that Brown's statement likely would be inadmissible if it were offered in a separate trial of Turpin. The statement probably would be offered to prove the truth of Brown's assertions to the interrogating officer, so it would be hearsay under Ky.R.Evid. 801(c), which is the Kentucky counterpart to Fed.R.Evid. 801(c). Turpin suggests that the statement would be admissible under Ky.R.Evid. 804(b)(3) as a statement against penal interest. This is not at all clear, however, because the parts of the statement that Turpin wants admitted are also exculpatory as to Brown. Further, as is the case with Fed.R.Evid. 804(b)(3), such a statement, when offered to exculpate the accused, is suspect and is admissible only if "corroborating circumstances *clearly indicate* the trustworthiness of the

statement." (Emphasis supplied.) For the reasons stated in the text, such circumstances are not present here. *Cf. Taylor v. Commonwealth,* 821 S.W.2d 72, 75 (Ky.1991), *cert. denied,* —— U.S. ——,112 S.Ct. 1243, 117 L.Ed.2d 475 (1992) (Rule 804(b)(3) applied when declarant's statement "was corroborated in part by five different witnesses. Every material detail of [the statement] was corroborated by independent testimony and physical evidence.")

We further note that, prior to the adoption of the Federal Rules of Evidence, the common law generally excluded hearsay statements against penal interest because they were thought to be unreliable. *See* 11 Jeremy C. Moore et al., *Moore's Federal Practice,* Art. VIII–280, (2nd ed. 1994). The Committee on the Rules of Evidence disagreed only in part with this assessment; thus the Committee eschewed a "simple corroboration" requirement for Rule 804(b)(3) in favor of the more stringent corroboration requirement quoted above. *See id.* at Art. VIII–231.

from a letter she wrote to Michael Turpin and an entry from her diary. The letter excerpt was written one year before Michael's murder and concerned one of Turpin's acquaintances. It stated:

> She lives in Manhattan and loves it. Her husband got killed in an oil rig accident and she got about five million in a settlement. She drives a red 944 and buys clothes all the time. She sells real estate, too.

(App. at 110.) Turpin's diary entry was written two years before Michael's murder, while Turpin was in high school. It stated:

> I see my life stretching disgustingly ahead of me. I see power, wealth and death in my pools of green eyes. Power because of my ability to manipulate people. Yes, that's right. I use · people only for the furtherance of my own being and the best part of it is that I feel no guilt or remorse concerning this fact. Well, what can I say? Along with power comes wealth. I know I can get everything I want. No problem. I admit I'm not perfect, but flaws do not stand in the way of achieving my highest, no matter how devious my means are. Now the difficult topic, death. Maybe alcohol, maybe overdose, maybe by means of violence. All I know is that I don't want to live past thirty. I'd like to die at twenty-seven. What a delightful age to kiss life good-bye. Then I could be just like James Douglas. Yet, he is incomparable to none. He is a Dionysius, and he lives. I heard something funny on a commercial one time. I think it was for the movie Reckless. It showed a teacher asking his students exactly what they wanted out of life and this hellion dude in black leather, you know the kind your mother would never let you go out with, well he writes M–O–R–E across his paper. Well, that's what I want out of life. More. There's got to be more in life than college, marriage and kids. Gross. I want to mix with the socially elite, not these crappy lowlives I can wrap around my finger. I would really like a challenge, but one I can overcome, which I will anyway regardless

of how devious or good my opponent is. Take it as it comes, though, and I will, but I will overcome.

(App. at 109–10.)

It is well-settled that, "[w]hile it is true that habeas relief cannot be granted simply 'on the basis of a perceived error of state law,' when an error rises to the level of depriving the defendant of fundamental fairness in the trial process, the claim is remediable on a petition for habeas corpus relief." *Serra,* 4 F.3d at 1354 (citation omitted). Although the trial judge and the Supreme Court of Kentucky held that the diary entry and letter excerpt were properly admitted to show Turpin's motives and state of mind (app. at 165), the magistrate judge determined that this evidence was erroneously admitted because it was not evidence of "similar acts," and because its probative value was substantially outweighed by the danger of unfair prejudice. The magistrate judge concluded, however, that the admission of this evidence did not render Turpin's trial fundamentally unfair. The district court agreed that this evidence was erroneously admitted, but further held that the admission of this evidence deprived Turpin of her due process right to fundamental fairness in the trial process.

In reviewing the district court's holding, we must first address the threshold issue of whether the Commonwealth has waived its right to argue that the letter excerpt and diary entry were properly admitted. In *United States v. Walters,* 638 F.2d 947, 950 (6th Cir.1981), we held that "a party shall file objections [to the magistrate's report and recommendation] with the district court or else waive right to appeal." We explained that this rule "comports with judicial efficiency and 'will often save the parties the expense and difficulty of appeal.'" *Id.* Since the Commonwealth did not present any objection to the magistrate judge's proposed findings of fact and recommendation, Turpin contends that the Commonwealth has waived its right to contest the magistrate judge's determination that the diary entry and letter excerpt were improperly admitted.

Although the magistrate judge proposed that the secondary issue of the admissibility of the writings be resolved in Turpin's favor,

he nonetheless concluded that the Commonwealth should prevail on its motion for summary judgment. If we were to require a party in the Commonwealth's position to present objections to a magistrate judge's proposed adverse resolution of a secondary issue, we would force that party to articulate objections to a recommendation that it prevail. Such a requirement would only frustrate the judicial economy and litigant expense policies that underlie the *Walters* rule. We therefore hold that the Commonwealth has not waived its right to argue that the letter excerpt and diary entry were properly admitted.[12]

We agree with the Supreme Court of Kentucky that these writings were properly admitted. With a few exceptions that are not material here, Kentucky has adopted the Federal Rules of Evidence. Thus, Ky. R.Evid. 404(b) provides for the admission of evidence of "other crimes, wrongs, or acts" if offered to prove, *inter alia*, motive. The prosecution argued at trial that Turpin had been motivated in part by her desire to collect the proceeds of Michael's life insurance policy. The letter excerpt hence was relevant to the issue of Turpin's motive, because the letter strongly suggested that Turpin had been envious of the prosperity that followed the death of her acquaintance's husband. The diary entry likewise was relevant to Turpin's motive, because it plainly displayed Turpin's longings for wealth. These writings accordingly were admissible under Rule 404(b).[13]

Moreover, we are unable to conclude that Rule 403 required the exclusion of these writings. A trial judge enjoys "very substantial discretion in 'balancing' probative value on the one hand and 'unfair prejudice' on the other[.]" *United States v. Moore*, 917 F.2d 215, 233 (6th Cir.1990), *cert. denied*, 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991)

(citation omitted). Indeed, in reviewing the trial judge's balancing under Rule 403, "the appellate court must view the evidence in the light most favorable to its proponent, giving 'the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Id.* (quoting 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[03] (1982)). That Turpin's letter excerpt and diary entry were written before her husband's murder does erode their probative value to some extent. Given, however, the critical importance of the issue of motive in Turpin's trial, we find that the trial judge did not abuse his "very substantial discretion" by determining that the probative value of these writings was not "substantially outweighed" by the danger of unfair prejudice.

Turpin contends, however, that the prosecutor in fact cited these writings as evidence of her character during his cross-examination of her parents and during his closing argument. Here, we note that the line between inadmissible evidence of character and admissible evidence of motive is sometimes less than clear. Evidence of a person's motives is sometimes mistaken for evidence of the propensities those motives have created. Turpin's diary entry provides an example of this fact; although she claims its mention of her "ability to manipulate people" is impermissible character evidence, that evidence was an integral part of the evidence of her longings for power and wealth. In any event, Turpin's contention does not alter our holding that the trial judge did not abuse his discretion by admitting these writings. An appellate court "must evaluate the validity of the [trial] court's ruling in light of the information available to the trial judge at the time of his ruling[,]" *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir.1982), and we see no reason why the trial judge should have

---

**12.** The Commonwealth argues in its brief that the letter excerpt and diary entry were properly admitted, but asserted during oral argument that the admission of these writings was harmless error. We do not think, however, that the Assistant Attorney General's extempore remarks remove from our consideration the issue of whether these writings were properly admitted.

**13.** The magistrate judge and district court construed Rule 404(b) only to allow for the admission of "similar" acts. Rule 404(b), however, provides for the admission of "other" acts, which is a broader class of acts than "similar" acts. *See* Rule 404(b); *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988) (referring to "'similar act' *and other* Rule 404(b) evidence") (emphasis supplied).

known that the prosecutor might refer to this evidence in an arguably improper manner.

■ Finally, we note that neither the letter excerpt nor the diary entry were inadmissible hearsay. The letter excerpt was not hearsay because it was not offered to prove that Turpin's friend indeed drove a Porsche and lived in Manhattan. Ky.R.Evid. 801(c). The diary entry was not inadmissible hearsay because it was a party admission, Ky.R.Evid. 801A(b)(1), and because it was a statement of Turpin's then-existing state of mind, Ky. R.Evid. 803(3).

## IV.

■ Turpin's remaining four arguments, which were rejected by the magistrate judge and the district court, are insubstantial. The first of these arguments concerns the arrest of one of the jurors who heard her case. After the jury found Turpin guilty, but before it had recommended her sentence,[14] one of the jurors, Kenneth Redmon, was arrested for the Kentucky law crime of conspiracy to promote gambling. Turpin moved for a mistrial upon learning of Redmon's arrest. The trial judge held a hearing, in which he carefully questioned Redmon about his ability to remain impartial. Redmon replied that his arrest would not affect his impartiality. The judge then questioned each of the other jurors on Turpin's panel individually about their impartiality and about whether they might discount Redmon's views because of his arrest. Each juror replied that he or she was entirely unaffected by the fact of Redmon's arrest. Thus assured of each of the jurors' impartiality, the trial judge denied Turpin's motion for a mistrial. Turpin now argues that the denial of her motion violated her constitutional rights to an impartial jury and due process of law.

The trial judge's finding that each of the jurors remained impartial after Redmon's arrest is a factual finding, *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), and thus is presumed correct unless Turpin proves otherwise by convincing evidence. 28 U.S.C. § 2254(d). Turpin has presented no evidence to rebut this presumption, and her unsupported speculations about possible juror bias provide no occasion for habeas corpus relief.

■ Turpin next argues that her trial was fundamentally unfair because she and Brown had to exercise jointly the twelve peremptory challenges allotted to them. In *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 2278–79, 101 L.Ed.2d 80 (1988), the Supreme Court stated that, "[b]ecause peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." (Citations omitted.) Thus, "the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Id.* Kentucky law provides that jointly tried criminal defendants may be forced to exercise jointly their peremptory challenges. *Dunbar v. Commonwealth,* 809 S.W.2d 852, 853–54 (Ky. 1991). Turpin's "right" to peremptory challenges therefore was not impaired by the fact that she had to exercise them with Brown.

■ Turpin next argues that she was denied due process of law when the trial judge refused to excuse for cause prospective jurors Kenneth Saunier, Brenda Crank, and Ed Baker. During voir dire, Saunier and Crank each stated that, based upon their prior knowledge of Turpin's case, they thought Turpin likely was guilty. Baker stated that he might be influenced by the fact that his supervisor thought Turpin was guilty. When questioned by the trial judge, however, each of these individuals stated that he or she could impartially consider Turpin's case. When the trial judge accordingly refused to strike these individuals for cause, Turpin peremptorily struck each of them.

As noted earlier, a state court's determinations as to juror impartiality are presumptively correct, and can be rebutted only by convincing evidence. 28 U.S.C. § 2254(d);

---

**14.** Ky.Rev.Stat.Ann. § 532.025(1) provides that, in capital cases heard by a jury, the jury shall recommend a sentence to the trial judge after considering the evidence which is presented during a special presentence hearing.

*Patton,* 467 U.S. at 1038, 104 S.Ct. at 2892. Moreover, because such a determination "is essentially one of credibility," it is entitled to "special deference." *Patton,* 467 U.S. at 1036, 104 S.Ct. at 2891. Here, Turpin has not presented sufficient evidence to carry her heavy burden. That the prospective jurors heard about Turpin's case before trial is not itself cause for rejecting the trial judge's determination, since "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Turpin has presented no other evidence that the trial judge's determinations as to the impartiality of these prospective jurors were erroneous. Her argument that the trial judge somehow impaired her due process rights by failing to strike these persons for cause therefore is without merit.

▮▮▮ Finally, Turpin argues that her due process rights were violated by the trial judge's refusal to instruct the jury on the Kentucky law offense of "hindering prosecution or apprehension in the first degree." This offense is defined as follows:

(1) A person is guilty of hindering prosecution or apprehension in the first degree when, with the intent to hinder the apprehension, prosecution, conviction or punishment of another whom he knows is being sought in connection with the commission of a capital offense or Class A felony, he renders assistance to such person.

Ky.Rev.Stat.Ann. § 520.120(1). In support of her argument, Turpin cites *Beck v. Alabama,* 447 U.S. 625, 637, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980). In *Beck,* the Supreme Court suggested that the due process rights of a defendant in a capital case may be violated if the jury is not given a lesser included offense instruction. *Id.*

Turpin's argument is meritless. Hindering prosecution or apprehension falls under Chapter 520 of the Kentucky Revised Statutes, which bears the title, "Escape and Other Offenses Relating to Custody." As its title and description suggest, the offense of hindering prosecution or apprehension concerns events occurring after, and thus separately from, the commission of another predicate crime. This offense accordingly is wholly distinct from, and is not a lesser included offense of, the crime of capital murder. The trial judge's refusal to submit a hindering prosecution or apprehension instruction to the jury therefore did not violate *Beck.* Indeed, the trial judge scrupulously adhered to the teachings of *Beck,* as he instructed the jury on the lesser included offenses of second degree manslaughter and reckless homicide.

The district court's grant of the writ of habeas corpus is **REVERSED.**

FEIKENS, Senior District Judge, dissenting in Parts II and III and concurring in Part IV.

In this case the majority condones clear errors committed by the Kentucky courts and, with its own reasoning supporting defendant-petitioner Elizabeth Turpin's conviction, wipes out Turpin's right to call Karen Brown as a witness in her behalf or to use Brown's exculpatory statement. Thus, I must dissent.

*Error 1:* Turpin moved for a separate trial. A separate trial would have enabled her to call Brown as a witness in her behalf. Alternatively in a separate trial, if Brown was unavailable as a witness, her exculpatory statement in Turpin's favor could be used. The denial of this motion was clear error.

*Error 2:* The Kentucky courts denied Turpin the constitutional right of trial by jury. Turpin was not present when her husband was killed; her guilt or non-guilt accordingly turns on whether she intended Brown and Keith Bouchard to commit this murder on her behalf. Brown was present at, participated in, and observed the series of crucial conversations between Brown, Turpin, and Bouchard during which, Bouchard contended at trial, Turpin agreed to this murder. Brown was the only person who could exculpate Turpin and her presence at these meetings accordingly is sufficient indicia of trustworthiness to permit the introduction of her statement. The Kentucky trial court, after ordering a joint trial, then did not allow the exculpatory statement made by Brown in Turpin's behalf to be used at the trial. Brown then declined to testify in her own

defense and Turpin was convicted by a jury which was prevented from hearing this vital evidence.

The majority, in an attempt to justify the Kentucky court's action, now weighs the exculpatory statement, concludes it is not trustworthy, and condones the conviction of Turpin.

*Error 3:* The trial court admitted character evidence, most notably an excerpt from Turpin's diary, which was clearly designed to show that Turpin acted in accordance with her character.

Our court, by reversing the district court's grant of the writ of habeas corpus, glosses over these errors by declaring that in a trial for murder, Turpin, who was not physically present when her husband was killed, would not be permitted to exculpate herself in the *only* possible way she could.

I. *The case against Turpin*

The majority begins its analysis with the confident assertion that Turpin agreed late one night in February of 1986 with Brown and Bouchard that they would kill Turpin's husband Michael. The assertion that Turpin intended for Brown and Bouchard to commit this murder is not unfounded: Bouchard testified at Turpin's and Brown's joint trial that Turpin actively participated in the scheme to kill Michael and a jury apparently believed him. It is important to remember, however, that the jury that ultimately found Turpin guilty of capital murder was not permitted to assume she was guilty. Unlike a court of appeals, the jury was required to start its analysis with a clean slate, a presumption of innocence. It returned its verdict after numerous hours of testimony over many days that painted a convincing picture of guilt. It found Turpin guilty because the evidence presented at trial convinced the jurors beyond a reasonable doubt that she had intended to kill her husband.

The two rulings by the trial court now upheld by the majority—denying Turpin's motion for severance and permitting character evidence to be used against her—unfairly skewed the evidence against Turpin and in favor of the Commonwealth of Kentucky. In reviewing the district court's decision granting a writ of habeas corpus, the majority fails to appreciate how vital these two rulings were both to the Commonwealth's case against Turpin and to the jury's task of determining the truth about Michael's murder. There was no physical evidence linking Turpin to the killing; unlike Brown and Bouchard, Turpin was not present when her husband was killed. The entire case against Turpin turned on the conversations that occurred between three people: Turpin, Bouchard, and Brown. Bouchard testified that Turpin, during the course of these several conversations, manipulated Bouchard and Brown into committing the murder. Turpin told a different story. She claimed that Bouchard and Brown misunderstood her intentions. (Tr. Vol. XVI at 9.) She admitted that she was angry with her husband on the night he was killed, that she had stated earlier that night that she sometimes wished he were dead, and that she understood that Bouchard and Brown would go over to the Turpins' apartment so that Bouchard could confront Michael. (*See, e.g.,* Turpin testimony, Tr. Vol. XVII at 60, 80, 95.) But confrontation is not murder. And Turpin stated that she never intended that Bouchard and Brown would murder Michael. (Turpin testimony, Tr. Vol. XVII at 97.)

To prevail in its case against Turpin, the Commonwealth accordingly had to convince the jury that Bouchard was telling the truth and that Turpin lied.[1] The Commonwealth had to convince the jury (1) that Turpin *could* manipulate others into committing murder, and (2) that she actually *did* intentionally manipulate Brown and Bouchard into killing Michael. The Commonwealth was assisted in the first of these tasks when the trial court admitted into evidence self-aggrandizing ramblings from Turpin's high school diary in which she boasted of her

---

1. The jury conceivably could have found that Turpin was telling the truth and that Bouchard

truthfully related his own misperceptions about

"ability to manipulate people."[2] The second of these two tasks was facilitated when the trial court refused Turpin's motion for severance. This refusal precluded the jury from hearing what Brown had to say about the crucial conversations these three had on the night that Michael was murdered. This is critically important, because Brown's testimony, either from the witness stand or through her statement, challenges the reliability of Bouchard's testimony: Had the jury heard this evidence, it reasonably could have believed Turpin's version of the events and returned a verdict of not guilty.

## II. *Severance*

As a general matter, a state trial court's refusal to grant severance mandates habeas corpus relief (1) when the joint trial "resulted in the deprivation of a specific constitutional guarantee such as the right to call witnesses ... or the right to confrontation," or (2) when the joint trial abridged the defendant's "fundamental right to a fair trial as secured by the Fourteenth Amendment...." *Jenkins v. Bordenkircher,* 611 F.2d 162, 168 (6th Cir.1979), *cert. denied,* 446 U.S. 943, 100 S.Ct. 2169, 64 L.Ed.2d 798 (1980). Turpin argues that separate trials would have given her the chance to call Brown to testify in her behalf, and to impeach her with the exculpatory statement.

The majority concludes in Part II of its opinion that a writ of habeas corpus is not warranted in this case because, it claims, Brown's statement, and her presumed in-court testimony during Turpin's separate trial, have dubious exculpatory value and bear inadequate indicia of reliability. Underlying this conclusion is an assumption that the terms "exculpatory value" and "indicia of reliability" have well-understood, universal meanings divorced from the context of a particular case. They do not. These terms are inherently contingent; that is, their meanings depend both upon the value of other *in* culpatory evidence presented

against the defendant and upon the amount of information available to the jury to determine the truth about what really happened. In short, the meanings of these terms depend upon the degree to which the evidence in question is critical to the correct resolution of the case. As a result, the majority misses the point of the criticalness inquiry of *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), when it states that "[t]here is of course no question that the excluded portion of Brown's statement pertained to critical issues in Turpin's trial." Whether the statement or Brown's testimony pertained to critical issues is not quite the question here. Instead, we must determine whether the statement or Brown's testimony is critical to the jury's task of ascertaining the truth.

The majority's interpretation has the effect of writing the *Chambers* criticalness inquiry off the books:. asking whether the statement "pertained to critical issues" at trial essentially reduces the inquiry into a type of relevancy requirement. This approach is at odds with that taken both by the U.S. Supreme Court in *Chambers* and by the other circuit courts of appeals. *Rivera v. Director, Dep't of Corrections,* 915 F.2d 280 (7th Cir.1990), is a good example. There, Judge Posner ruled that the confession of Rivera's codefendant was critical, but not merely because it "pertained to critical issues." Instead, he held on facts bearing a striking resemblance to those in Turpin's case that the confession was vital evidence (and that habeas corpus relief was mandated) because without the codefendant's confession "it was Rivera's word against [witness] Meger's." *Id.* at 281; *see also Byrd v. Wainwright,* 428 F.2d 1017, 1020–22 (5th Cir. 1970) (severance to permit the admission of evidence mandatory on similar facts); *cf. United States v. Shuford,* 454 F.2d 772, 779 (4th Cir.1971) (admitting evidence was required on facts similar to those at bar because the codefendant's testimony "took on unusual importance" for the defendant's de-

---

what really happened. In that case, it would have had to acquit.

**2.** She also boasted of her ability to wrap "crappy lowlives" around her finger. As discussed in Part III of this opinion, *infra,* the prosecutor used this term repeatedly and effectively during his cross examination of Turpin to show that she was the sort of person who would use her friends—Bouchard and Brown—to commit this crime on her behalf.

fense); *United States v. Echeles*, 352 F.2d 892, 896–98 (7th Cir.1965) (same); *see also* Peter W. Tague, *Perils of the Rulemaking Process: The Development, Application and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 Geo.L.J. 851, 1006 (1981) [hereinafter Tague, *Rule 804(b)(3)* ] (noting that out-of-court statements should be admitted in situations similar to those at bar because the statements are critical to determining defendant's guilt); Robert N. Clinton, *The Right to Present a Defense: An Emergent Constitutional Guarantee in Criminal Trials*, 9 Ind.L.Rev. 711, 808–09 (1976) (arguing that the "admission of hearsay evidence with no extrinsic indicia of reliability might be constitutionally compelled if the evidence is of critical importance to the accused"); *cf. Washington v. Texas*, 388 U.S. 14, 16, 87 S.Ct. 1920, 1921–22, 18 L.Ed.2d 1019 (1967) (state evidence rule must yield to permit a defendant to call as a witness the only other person who had witnessed the crime charged).

A proper analysis of Turpin's habeas corpus appeal therefore requires this court to evaluate the importance of Brown's testimony and her statement in the context of *this* case. Then, *keeping in mind the importance of this evidence to the jury's task of ascertaining truth*, we must consider whether a *fair* evaluation of this evidence tends to exculpate Turpin and whether the statement[3] bears sufficient indicia of trustworthiness to assist the jury in its truth-seeking task.

### A. *Criticalness*

To fully appreciate why Brown's testimony and her statement are vital to a determination of guilt requires a closer look at the Commonwealth's case against Turpin.

The issue at trial was whether the jury would believe Bouchard, who claimed that Turpin participated in planning Michael's murder, or Turpin, who claimed that she never intended that Michael would be murdered. The Commonwealth, although admitting that most of its case was based on Bouchard's testimony, nevertheless claims that other evidence corroborates Bouchard's version of the events. This is important to my analysis because other evidence incriminating Turpin would tend to refute Turpin's claim that Brown's statement is critical evidence.

The Commonwealth accordingly points to testimony that it claims corroborates Bouchard's story. For example, it argues that Chris Elliot, an overnight guest in Brown's apartment on the night Michael was murdered, corroborated Bouchard's testimony about the timing of the events on the night of Michael's murder. The problem with this "corroborating evidence," of course, is that no one seriously contests the timing of the events. In fact, Turpin's own testimony to a large degree corroborates that of Elliot's and Bouchard's. What Turpin *does* contest—and what is vital here—is Bouchard's claim that Turpin *intended* to cause the death of her husband.

Other evidence conceivably corroborating Bouchard's claim is Anthony Basham's testimony that he once was present when Turpin announced to Brown, Basham, and Doug Elliot (Brown's apartment mate and Chris Elliot's brother) that "we could bump him off; you know, get the money." (App. at 323.)[4] But, as the majority seems to recognize, the inculpatory weight of this evidence pales when compared to the testimony Bouchard offered at Turpin's trial: Basham himself testified that he thought Turpin was joking when she made this statement. (Basham testimony, Tr. Vol. XII at 13–14, 30, 55.)[5]

---

3. As I note below, this trustworthiness consideration would not be present were Brown actually to testify at a separate trial of Turpin.

4. Another possible source of this assertion is life insurance agent Matt Richie's testimony. He testified that Turpin stated to her husband, "Mike, you're worth more dead than you are alive." Richie stated that he heard this sort of statement often in the insurance business, however.

5. As I discuss further below, Brown's statement also indicates that Turpin joked about killing her husband, albeit at a later time.

It is true that at trial Basham stated that he no longer thought that Turpin was joking when she made the statement. He had changed his mind by the time of trial, however, because of the evidence he had heard from the police and because Turpin had been accused of the murder. (Basham testimony, Tr. Vol. XII at 55). Bas-

Joking about a crime is crucially different from suggesting one.

Three people have a series of conversations. Two of them break away and commit a murder. The guilt or non-guilt of Turpin turns on what was said during those conversations. The jury heard Bouchard's version and it heard Turpin's version. The *only other* witness to these conversations was Brown. But the jury did not hear Brown's story: it was forced to decide Turpin's fate by choosing between these two fundamentally different versions of the crucial conversations between three people without hearing what Brown said. Paraphrasing Judge Posner's opinion in *Rivera*, without Brown's version of the events, it was Turpin's word against Bouchard's. No one can doubt that Brown's version—if available—is vital evidence. *Rivera*, 915 F.2d at 281; *see also Shuford*, 454 F.2d at 779; *Byrd*, 428 F.2d at 1020–22); *Echeles*, 352 F.2d at 896–98; *see also* Tague, *Rule 804(b)(3), supra*, at 990, 1006 (noting the importance of a codefendant's exculpatory statements in a three-person crime like the one at bar); Clinton, *supra*, at 808–09; *cf. Washington*, 388 U.S. at 16, 87 S.Ct. at 1921–22.

### B. *Karen Brown's testimony*

Turpin argues that had her trial been severed from Brown's, she could have called Brown to testify in her behalf. The majority dismisses this part of Turpin's argument with a footnote. I find this somewhat puzzling, because the trustworthiness considerations that the majority finds so bothersome in Brown's bare statement do not exist if Brown actually takes the stand. In that situation, the jury would have ample opportunity to evaluate Brown's demeanor—much as it had the opportunity to evaluate Bouchard's.

The majority correctly notes that whether severance is mandated in these "codefendant testimony cases" turns on "whether the codefendant in fact would testify in a separate trial and, if so, what the precise nature of that testimony would be." *Supra* (citing

ham's later interpretation has no effect on the analysis.

**6.** Alternatively, Brown's testimony could be assured by granting her use immunity during Tur-

*Byrd*, 428 F.2d at 1020–21). The majority nevertheless dismisses Turpin's argument, claiming that we can only speculate as to whether Brown would choose to testify in a separate trial of Turpin. *Supra*, at n. 3. I do not agree with this analysis. Here, as in *Byrd*, assuring Brown's testimony simply would require her to be tried first. *See Byrd*, 428 F.2d at 1021–22 (noting that both severance and trying defendant Byrd last was necessary because of his "unique interest in being tried separately").[6] Turpin could then subpoena Brown to testify and, if Brown were a hostile witness, her statement could be used to impeach her—much as the defendant attempted to do in *Chambers*.

Further, as the majority admits, this case is unlike the usual codefendant testimony case because we are fairly certain of what the precise nature of Brown's testimony would be; her version of the events is well known from her statement. This case is not like *United States v. Paulino*, 935 F.2d 739 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991), in which a defendant is relying on "[v]ague allegations" regarding the exculpatory value of a codefendant's testimony. A fair reading of Brown's statement, as I note below, clearly exculpates Turpin. Brown either would have testified in conformity to her statement, or if she deviated, Turpin's attorney could have used the statement to impeach her.

The majority acknowledges that Brown's statement has exculpatory value but dismisses its value as "dubious" and therefore not rising to the "clearly exculpatory" standard it seems to prefer. I disagree with this assessment and discuss the exculpatory value of Brown's statement at great length below. For now, however, it is worth noting that once we have determined that a codefendant's testimony or statement could have affected the outcome of the trial, we have no business considering further the *degree* to which the testimony or statement would have been exculpatory. The cases that the Com-

pin's separate trial. *See* Peter Westen, *The Compulsory Process Clause*, 73 Mich.L.Rev. 71, 165–68 (1974).

monwealth cited in support of this balancing approach—*Paulino; United States v. Whitley,* 734 F.2d 1129 (6th Cir.1984); *United States v. Mariscal,* 939 F.2d 884 (9th Cir. 1991); *United States v. Ford,* 870 F.2d 729 (D.C.Cir.1989); *United States v. DeLuna,* 763 F.2d 897 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985); *United States v. Abraham,* 541 F.2d 1234 (7th Cir.1976), *cert. denied,* 429 U.S. 1102, 97 S.Ct. 1128, 51 L.Ed.2d 552 (1977)—are inapposite to this case. Those cases, as the majority recognizes, address situations in which a defendant moves for a separate trial to enable a codefendant to actually testify in his or her behalf. In those situations, the substance of the codefendant's testimony is unknown, and the trial court is in the best situation to "weigh a number of factors, among them, 'the good faith of the defendant's intent to have a codefendant testify, the possible weight and credibility of the predicted testimony, the probability that such testimony will materialize, [and] the economy of a joint trial.'" *Mariscal,* 939 F.2d at 885 (quoting *United States v. Kaplan,* 554 F.2d 958, 966 (9th Cir.) (per curiam), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977)). The same sort of balancing is not warranted here because we know the substance of Brown's statement. *See, e.g., Shuford,* 454 F.2d at 778 (noting on similar facts that without knowing with certainty the substance of the excluded evidence, "appellate court[s] rightfully refuse[ ] to indulge in pure supposition as to what the behavior of the co-defendant would have been if the requested severance had been granted ... [but when the substance of the evidence is known, appellate courts may determine that severance should have been granted because then courts] are not called upon to engage in an exercise of clairvoyance"); *Byrd,* 428 F.2d at 1020 (severance mandated to permit codefendant to testify in defendant's trial where the defendant made "a clear showing of what the codefendant would testify to"); *Echeles,* 352 F.2d at 898 (severance mandated because the trial court

had knowledge of codefendant's testimony protesting defendant's innocence).

Our role instead is to consider Brown's story as a whole to determine whether a fair reading exculpates Turpin to the degree that its admission could have " 'affected the outcome of the trial.' " *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867–68, 102 S.Ct. 3440, 3446–47, 73 L.Ed.2d 1193 (1982), (quoting *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976)); *Washington,* 388 U.S. at 23, 87 S.Ct. at 1925 (State may not arbitrarily deny defendant "the right to put on the stand a witness who was ... capable of testifying to events he personally observed, and whose testimony would have been relevant and material to the defense"); *Stephens v. Miller,* 13 F.3d 998, 1005 (7th Cir.1994) (Flaum, J., concurring); *cf. Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment").[7] Brown's story is known through her statement and, as the majority seems to admit, is exculpatory. Under U.S. Supreme Court precedent, Turpin must "make some plausible showing of how [Brown's] testimony would have been material and favorable to the defense." *Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. at 3446. She has done so. Severance should have been granted so that Brown could testify in Turpin's separate trial.

### C. *Karen Brown's statement*

Brown's statement requires severance whether she testifies or not.

Brown told her story to Detective Gibbons in a tape-recorded statement on February 8, 1986, a few days after Michael Turpin was murdered. A fair reading of that statement shows that, given the context of this case, the jury could have believed the story that Brown told in her statement, and if it did believe her story, it would have been forced to conclude that Turpin was either (1) merely

---

7. The majority dismisses these "access to evidence" cases, stating that it prefers to hew close to the *Chambers* analysis. I find this odd, because Turpin's appeal in part is based on her claim that a separate trial would have permitted her to call Brown as a witness.

joking about killing her husband, or (2) at most guilty of assault. This statement also bears sufficient indicia of trustworthiness, particularly when we consider its criticalness in the peculiar context of this case.

### 1. *Brown's statement, if believed, clearly exculpates Turpin*

The majority claims that Brown's statement does not exculpate Turpin because "(1) on the night of the murder, Turpin was the first person to mention the idea that they kill her husband; (2) shortly before the murder, Turpin discussed with Brown and Bouchard the possibility of killing her husband that night; and (3) although Turpin knew that Bouchard and Brown were going to Turpin's apartment when they left to commit the murder, she did not try to stop the pair, but instead told Bouchard to 'do what you have to do.'" This is not a fair reading of Brown's statement. This is advocacy. Rather than evaluating objectively whether Brown's statement tends to exculpate Turpin to the degree that its admission could have affected the outcome of Turpin's trial, the majority attempts to gather evidence to bolster the conclusion that Turpin is guilty.[8]

First, the inference that the majority would have one draw from its first comment—that Turpin mentioned the idea of killing Michael—is that Turpin actually instigated the murder. This is a misleading description of Brown's statement. What Brown actually said was that Turpin was drunk and that she stated "in a joking manner" that they should kill her husband. It is noteworthy that Brown also stated that Bouchard seemed to misinterpret Turpin's joking manner and took her seriously—evidence that actually lends support to Turpin's argument that Bouchard mistakenly thought that she wanted him to kill Michael. (*See* Tr. Vol. XVI at 9.) The following excerpt from Brown's statement puts the alleged "instigation" back in its proper context:

> Brown: And then, so ... well after the car was moved ... you know, well I didn't

want Liz going home cause I was afraid she would get beat up and I told Keith that. And uh ... I don't know whether Liz was serious or not, but she made the statement, which shouldn't have been a joking statement, that she said, "Well, we should kill him." *I mean she said it in a joking manner, but that's not a joking statement and Keith took her seriously Liz was drunk, she was drunk.*

(App. at 245 (emphasis added).)

Other parts of Brown's statement also tend to refute the majority's view that Turpin instigated the killing. Brown explained, for example, that Bouchard continued to suggest that they kill Michael and that Turpin became upset because of this. (App. at 245, 250.) Brown also stated that "she never did say kill him," (app. at 251), and that Turpin did not go along to the Turpin apartment "[c]ause she didn't think we'd do it" and because "[s]he thought we were bullshittin," (app. at 246). Further, Brown stated that Turpin had no knowledge of Brown's attempts earlier that evening to get a gun to kill Michael. (App. at 247–48.)

The majority's second claim—that Brown's statement reveals that Turpin discussed the possibility of killing her husband that night— also takes Brown's statement out of context. Brown actually described the alleged "discussion" quite differently:

> Gibbons: And the three of you got to talking about killing Mike?
>
> Brown: Uh huh (indicated yes).
>
> Gibbons: Is that right?
>
> Brown: Yeah.
>
> . . . .
>
> Brown: Keith was instigating it. I think he ... didn't even know Mike. (App. at 250.)
>
> . . . .
>
> He said because he didn't want to see Liz fucked over. (App. at 251.)
>
> . . . .

---

**8.** The majority claims that it rejects the notion of employing an "abuse of discretion" standard. In reality, however, its analysis of Brown's statement is quite similar to the "sufficiency of the evidence" type review ordinarily employed when appellate courts review under an abuse-of-discretion standard.

Yeah and then I got up cause I didn't want to hear it. And then I sat back down and Liz got upset and she didn't want to hear it, she didn't want to listen to it. She just said do what you want to do, she said, I'm not ... she said I don't want to hear it. (*Id.*)

. . . .

She [Turpin] never did say to kill him. (*Id.*)

. . . .

She told him [Bouchard] she thought he was crazy. (*Id.*)

. . . .

I think she thought he was going to go over there and rough him up [but not to kill him.] (*Id.*)

. . . .

[Turpin didn't go bec]ause she said she didn't want to see him get whipped. (App. at 252.)

. . . .

I told [Turpin] I was scared, I said I don't know what he's going to do, you know, I said I think he's going to rough him up and she didn't seem too upset about that.... (App. at 252.)

. . . .

He said he was going to rough him up, [but didn't say he would kill Michael] until he got to the door of the apartment. (App. at 254.)

The inference the majority would have one draw from its final claim is that Turpin did not stop Brown and Bouchard from going to the Turpins' apartment although she knew that the two were going to kill Michael. Again, this inference mischaracterizes Brown's statement. What Brown actually stated was that Turpin "thought [Bouchard] was going to go over there and rough [Michael] up," but not to kill him. (App. at 251; *see also* app. at 252, 254.) The difference is crucial.

Brown's statement also tends to support Turpin's version of the events in a way not mentioned in the majority's opinion. Throughout the trial, the prosecution made much of the fact that Turpin initially lied to the police as to what she knew about Mi-

chael's murder. In her own testimony, Turpin did not contest that she lied to the police. She explained that she lied because Bouchard indicated after the murder that the three were all in it together and because she thought at the time that she would look guilty if Bouchard testified against her. (*See, e.g.,* Turpin testimony, Tr. Vol. XVIII at 87.) Parts of Brown's statement tend to confirm these claims. Brown stated: "[Bouchard] told Liz at the apartment, he said, nobody will ever tell.... And uh ... me and Liz has talked about it you know and we wanted ... we both wanted to come down here and tell, but we didn't and I don't know why we didn't ... and we just covered up, we kept covering up." (App. at 246–47; *see also* app. at 259 (where Bouchard threatened Brown that he would "tell them that you killed him."))

A more dangerous flaw in the majority's analysis, however, is its failure to analyze the exculpatory value of Brown's statement both in light of the amount of information available to the jury to determine the truth about what really happened and in light of the inculpatory evidence presented against Turpin at trial. The exculpatory value of evidence cannot be determined in a vacuum. I have already discussed why Brown's version of the events is vital to the jury's truth-seeking task. A proper evaluation of the statement's exculpatory value also requires an evaluation of the evidence presented *against* Turpin. That is, we must evaluate the inculpatory value of Bouchard's testimony as well as the exculpatory value of Brown's statement.

The jury was given several reasons to disbelieve Bouchard's testimony. Most notable of these was that Bouchard had only agreed with the prosecution to testify against Turpin to avoid facing the death penalty. (*See e.g.,* Bouchard testimony, Tr. Vol. XII at 145–50, Tr. Vol. XIII at 24.) Further, that Bouchard had been drinking heavily and ingesting cocaine on the night of the murder supports Turpin's claim that Bouchard misunderstood her intentions. Further supporting the argument that Bouchard was mistaken is the fact that during trial Bouchard repeatedly confused Turpin with Brown, and

Michael Turpin—the man he murdered—with Doug Elliot—his girlfriend's brother and another witness in the case. (*See, e.g.,* Bouchard testimony, Tr. Vol. XII at 99, 101.) The jury heard this evidence but nonetheless believed Bouchard and not Turpin. No one knows what its verdict would have been had it heard Brown's statement.

The majority notes that "in considering whether the excluded portion of Brown's statement clearly exculpates Turpin, we regard the *whole* of the excluded portion of the statement, not merely those snippets that Turpin maintains are exculpatory as to her...." *Supra,* at n. 6. I agree. I find, however, that the same rule should apply to the majority's analysis. Rather than concentrating on those "snippets" of Brown's statement which arguably inculpate Turpin (when taken out of context), on habeas corpus review we must "regard the *whole* of the excluded portion of the statement" in light of both the other *in* culpatory evidence presented against the defendant and the amount of information available to the jury to determine the truth as to what really happened. With this in mind, a fair reading of the excluded portion of the statement as a whole reveals that the statement, if believed, clearly exculpates Turpin of the crime of murder.

2. *Brown's statement, in this context, is sufficiently trustworthy and should have been admitted*

The undisputed truths about this case are that three people were involved and that Turpin was not present at the scene of the murder. The Commonwealth based its entire case on Bouchard's version of several conversations in which Turpin participated. No one contests that Brown personally witnessed the crucial conversations. Her statement accordingly is sufficiently trustworthy to have gone to the jury. *See Echeles,* 352 F.2d at 898 (noting on similar facts that "considering the obvious importance [of a witness's exculpatory evidence,] a fair trial for Echeles necessitated providing him the *opportunity* of getting the [exculpatory evidence] before the jury, regardless of how we might regard the credibility of that witness or the weight of his testimony"); *Shuford,*

454 F.2d at 777 (noting on similar facts that "[a] verdict based so heavily on less than the full available testimony, where the missing testimony could, with relative ease, have been procured, should not stand"); Tague, *Rule 804(b)(3), supra,* at 990, 1006 (arguing that Rule 804(b)(3)'s corroboration requirement fails to acknowledge the importance of a codefendant's exculpatory statements in a three-person crime like the one at bar); *cf.* Clinton, *supra,* at 808–09 (advocating the admission of hearsay evidence with no extrinsic indicia of reliability if the evidence is of critical importance to the accused).

The majority—while never contesting the fact that Brown was a witness to and a participant in these crucial conversations—dismisses Brown's statement as "fundamentally untrustworthy," particularly when compared with the testimony excluded in *Chambers.* I do not contest the observation that the testimony in *Chambers* bears more indicia of reliability than Brown's statement, although I do note that *Chambers* nowhere states that such a high degree of corroboration was absolutely necessary to its decision. Where I do disagree with the majority is with its inference that Brown's statement should be excluded because it is not as trustworthy as the evidence excluded in *Chambers.* The majority seems to assume the term "indicia of reliability" has a well-known, universal meaning divorced from the context of a particular case. I do not think that the case law supports that approach. Instead, the better approach—and the approach adopted by the cases—is to evaluate the degree of trustworthiness in light of the information available to the jury to determine the truth about what really happened.

The significant events in *Chambers,* for example, were witnessed by numerous individuals, one of whom claimed that he saw Chambers shoot Officer Liberty and another who saw Chambers "break his arm down" shortly after the fatal shots were fired. *Chambers,* 410 U.S. at 286, 93 S.Ct. at 1041. Given such ordinarily convincing evidence, it is not surprising that the Court welcomed the high degree of the trustworthiness of the evidence tending to exculpate the defendant. In Turpin's case, on the other hand, the

jurors were forced to decide whether they believed Turpin or whether they believed Bouchard. Here, "where the elusive quality of credibility is of such importance, the jury should have the benefit of all relevant testimony likely to shed light on the situation." *Shuford,* 454 F.2d at 777. Brown's statement must be admitted because it was the only other evidence which could have assisted the jury in its attempt to ascertain the truth.

I am bothered by the majority's claim that Brown's statement is fundamentally untrustworthy because "critical portions of Brown's statement were 'corroborated' only by Turpin's own self-serving testimony at trial." Of course, these uncorroborated, "critical portions of Brown's statements" are her statements regarding the motives and intentions of Brown, Turpin, and Bouchard. In short, it seems that the majority would admit Brown's statement only if Turpin could corroborate the exculpatory part of the statement itself.

The facts in this case dramatically underscore the error in requiring corroboration for the statements themselves. Brown stated that Turpin did not intend to kill her husband. Turpin's accuser's testimony contradicts this. That Brown's statement was contradicted by Bouchard's testimony, so the majority reasons, therefore tends to show that Brown's statement is "fundamentally untrustworthy." As Judge Posner wrote in *Rivera,* "[t]here is no 'therefore.'" *Rivera,* 915 F.2d at 282. He wrote: "[Defendant] Rivera's whole purpose in wanting to place the confession in evidence was to challenge the reliability of [witness] Meger's testimony. It begs the question to *assume* that Meger's

testimony was reliable, implying that *any* contrary evidence would be unreliable." *Id.*

The majority fails to appreciate that the exculpatory part of Brown's statement is crucial *because* it cannot be corroborated. Under its cramped reading of *Chambers'* trustworthiness requirement, Brown's statement would only be admissible if some other witness had been present and had corroborated Brown's statement that Turpin did not intend to cause the death of her husband. But then, perhaps, this other witness could have testified in Turpin's behalf and Brown's statement would not have been vital. The majority's analysis thus places Turpin in an unconstitutional Catch–22 position.

Judge Weinstein's analysis regarding the admissibility of exculpatory statements under Fed.R.Evid. 804(b)(3)[9] provides a much more insightful approach. He explains:

> If, for example, the proof is undisputed that the person confessing to a shooting could not have been at the scene of the crime because he was in prison, it will be excluded. But if there is evidence that he was near the scene and had some motive or background connecting him with the crime, that should suffice.

4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 804(b)(3)[03] at 804–154–55 (1993); *see also id.* at 804–157 (noting that "[t]oo restrictive an interpretation [of Rule 804(b)(3) ] may create due process problems"). Brown's statement, given these peculiar facts, must be admitted.

Nor would my decision change if I were to adopt the majority's balancing approach.[10]

**9.** Cases interpreting Rule 804(b)(3), while not strictly controlling here, assist my analysis because they shed some light on what sorts of circumstances might indicate the trustworthiness of Brown's statement.

**10.** It is worth noting that the majority decides that Brown's tape-recorded statement is untrustworthy from a written transcript and not from the tape recording itself. In a separate trial of Turpin, the jury would actually hear the tape recording (with its various nuances and intonations) and would be in a better position to evaluate Brown's credibility than we are from this cold record. At the very least, we should remand to the district court for an evidentiary

hearing to determine this mixed question of fact and law and avoid the temptation to find facts for ourselves. *See, e.g.,* James S. Liebman, *Federal Habeas Corpus Practice and Procedure* §§ 20.3, 32.3(b) (1988 & Supp.1993); *cf. Norris v. Risley,* 878 F.2d 1178, 1180–83 (9th Cir.1989) (remanding to district court to hold evidentiary hearing to determine facts underlying petitioner's habeas corpus claim). Upon remand, the district court would have the opportunity to listen to the actual tape recording. The evidentiary hearing also would give both Turpin and the Commonwealth the opportunity to put Brown on the witness stand and simply ask her whether she was telling the truth when she gave her exculpatory statement. This is the very least we could do in a capital murder case in which the evidence essen-

There is much in the record in this case that would " 'clearly' permit a reasonable man to believe that the statement might have been made in good faith and that it could be true." *Id.* at 804–154. First, Brown's general version of the events—once she actually started confessing, not when she still was attempting to deny her involvement—to a large degree is corroborated by the story told by Bouchard at trial. Brown's statement parrots Bouchard's testimony that after leaving the Circus nightclub on the night of the murder, Bouchard, Brown, and Turpin ended up in Brown's apartment. (Chris Elliot showed up with Bouchard but immediately went to bed.) Turpin then remained at Brown's apartment while Bouchard and Brown left and went to Bouchard's trailer home and obtained some knives. Bouchard and Brown then drove in Brown's car to the Turpins' apartment, where Bouchard stabbed Michael repeatedly. These two then left the Turpins' apartment and dumped Michael's body in a local park.

More probative of the truthfulness of Brown's statement are the numerous details that are also corroborated by Bouchard's testimony. For example: (1) Turpin's car had been moved on the night of the murder, (app. at 245), (Bouchard testimony, Vol. XII at 86); (2) Bouchard had been bragging that evening about having been in New York street fights, (app. at 245), (Bouchard testimony, Vol. XIII at 56–57), and was romantically interested in Turpin, (app. at 251), (Bouchard testimony, Tr. Vol. XIII at 65); (3) Brown claimed that she left the Circus for a short while earlier in the evening in an attempt to get a gun, (app. at 247–48), (Bouchard testimony, Tr. Vol. XII at 87–88); (4) after Brown's performance at the Circus, the trio ended up at Brown's apartment, (app. at 249), (Bouchard testimony, Tr. Vol. XII at 91–92); (5) the three then had a conversation about killing Michael, (app. at 250), (Bouchard testimony, Tr. Vol. XII at 92–96); (6) Bouchard and Brown took three kitchen knives to the murder scene, (app. at 248–49, 255), (Bouchard testimony, Tr. Vol. XII at 97–101); (7) Bouchard hid the knives in a pair of fingerless leather gloves, (app. at 255), (Bouchard testimony, Tr. Vol. XII at 97–101); (8) after Michael answered

the door to the Turpins' apartment, Bouchard told him that Turpin was drunk and missing, (app. at 256), (Bouchard testimony, Tr. Vol. XII at 102); (9) at the Turpins' apartment, after Bouchard killed Michael, Brown gave Bouchard a towel and grabbed a pack of cigarettes, (app. at 246, 258), (Bouchard testimony, Tr. Vol. XII at 107, 112); (10) the two wrapped Michael's body in one blue blanket and one white blanket, (app. at 259), (Bouchard testimony, Tr. Vol. XII at 112–13); (11) upon leaving the Turpin apartment with Michael's body, Bouchard stopped on the balcony to rest and to adjust the body, (app. at 259), (Bouchard testimony, Tr. Vol. XII at 113); and (12) after dumping the body, Bouchard placed the blankets in a garbage dumpster, (app. at 261), (Bouchard testimony, Tr. Vol. XII at 115–16.)

The majority dismisses the force of these corroborating details, claiming that Brown's statement cannot be believed because her story "changed dramatically over the course of her interrogation, as she sought to escape criminal liability." It is worth noting, however, that during the course of questioning, Brown never changed her story about Turpin's intent; she never stated that Turpin instigated or intended the killing. Furthermore, the fact that Brown's story changed markedly over the course of her interrogation does not at all mean that she was lying at the end of her statement when she exculpated Turpin. A close reading of the entire statement very well could lead a reasonable jury to an opposite conclusion.

At the beginning of the interrogation, Brown denied any involvement in the murder. It is clear that she was lying at that point. Slowly, but effectively, Detective Gibbons poked holes in her story until she finally broke down and stated that she would reveal the truth "If there is a lawyer present." (App. at 241.) The fact that Brown was lying initially, and was persistently trapped in lies, actually is evidence that she was telling the truth in the latter portion of her statement. Supporting this conclusion is the fact that once she asked for a lawyer, her story stopped changing. *Cf. United States v. Noel,* 938 F.2d 685, 688 (6th Cir.1991) (emphasizing

tially boiled down to a swearing match between the petitioner and her accuser.

that a codefendant's statement exculpating the defendant was untrustworthy, in part because the codefendant later recanted). At least Detective Gibbons seemed to think that Brown was telling the truth at that point; he stopped his interrogation shortly thereafter.

There also is circumstantial evidence corroborating Brown's assertion that Turpin was merely joking about killing her husband and that Bouchard misunderstood Turpin's intentions. Anthony Basham testified that Turpin had joked publicly about killing her husband at least once before. (Basham testimony, Tr. Vol. XII at 13–14, 30, 55.) Basham's testimony makes it more likely that Brown correctly perceived that Turpin was joking (as she allegedly was wont to do) when she stated, "Well, we should kill him." That Bouchard might have misunderstood Turpin is supported by evidence that Bouchard often was confused about things. As I noted above, Bouchard's testimony reveals, for example, that he repeatedly confused Turpin and Brown. (Bouchard testimony, Tr. Vol. XII at 101, 103.) Even more dramatic is the fact that Bouchard consistently mixed up Michael Turpin—the man he murdered—with Doug Elliot—his girlfriend's brother. (See, e.g., Bouchard testimony, Tr. Vol. XII at 99, 101.)

Further supporting the trustworthiness of Brown's statement is the fact that the Commonwealth used the statement throughout its investigation, and, indirectly, during Bouchard's testimony at trial. The transcripts show that the Commonwealth guided Bouchard's testimony with a statement he earlier had given to the police. In fact, as he admitted on cross-examination, his plea agreement with the prosecution *required* him to follow precisely his previous statement to avoid the death penalty. (See, e.g., Bouchard testimony, Tr. Vol. XII at 145–50, Tr. Vol. XIII at 24.) But the testimony also reveals that Bouchard had reviewed Brown's statement and that the police elicited Bouchard's own statement by going over the excluded portion of Brown's statement with him. (See Bouchard testimony, Tr. Vol. XIII, at 67–72.) Thus, the Commonwealth trusted Brown's statement sufficiently to use it—albeit indirectly—to guide Bouchard's trial testimony.

*Cf. United States v. Benveniste,* 564 F.2d 335, 339 (9th Cir.1977) (reversible error when hearsay statements inculpating the defendant were admitted but hearsay statements exculpating the defendant, made during the same meeting, were excluded).

A more fundamental error in the majority's balancing analysis, however, is its failure to analyze the trustworthiness of Brown's statement in light of the trustworthiness of evidence presented against Turpin at trial. As with the exculpatory value of evidence, the trustworthiness of evidence cannot be determined in a vacuum. While the majority makes much of its claim that Brown's statement shows that she was trying to escape liability, for example, it fails to acknowledge that the trustworthiness of Bouchard's statement is highly questionable because he had only agreed with the prosecution to testify against Turpin and Brown to avoid facing the death penalty. (See e.g., Bouchard testimony, Tr. Vol. XII at 145–50, Tr. Vol. XIII at 24.) That the jury was permitted to evaluate the trustworthiness of Bouchard's testimony but not Brown's statement is particularly unfair because the prosecution—and not Turpin—controlled both whether Bouchard could plea bargain and whether Brown would be given use immunity so that she could testify at a separate trial.

This leads to the most disturbing aspect of this case: the general lack of effort on the trial court's part to determine either whether Brown would testify in a separate trial or whether Brown's statements were trustworthy. *See United States v. DeLuna,* 763 F.2d 897, 920 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985) (court made *in camera* inquiry into whether codefendant would testify in a separate trial). This was not a case where Brown was "unavailable" in the usual sense. She only *might* have been unavailable had she invoked a privilege not to incriminate herself. If there were any questions about the truthfulness of Brown's statement, the court at least could have attempted to question Brown outside of the presence of the jury, perhaps under a grant of use immunity. *See* Tague *Rule 804(b)(3), supra,* at 952 n. 508; Peter Westen, *The Compulsory Process Clause* 73

Mich.L.Rev. 71, 165–68 (1974) (advocating use immunity as a way of reconciling the defendant's right to introduce evidence with another defendant's right against self incrimination); *cf. Chambers*, 410 U.S. at 301, 93 S.Ct. at 1049 ("[I]f there was any question about the truthfulness of the extrajudicial statements, [the person who allegedly made the statements] was present in the courtroom and had been under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.").[11]

The majority seems motivated by the idea that the reason for the *Chambers* trustworthiness requirement is to permit courts to ferret out and exclude out-of-court exculpatory statements in circumstances where there is a strong risk that the statements were fabricated. What the majority fails to appreciate, however, is that the reason why courts should exclude fabricated exculpatory statements is because they might interfere with the jury's truth-seeking role. The criminal defendant's interest in introducing the exculpatory evidence is increased in cases like Turpin's because—under these peculiar facts—the evidence is crucial to the jury's task of determining the truth about what happened.

I do not say that Brown is telling the truth in her statement. She might have lied in the

statement about Turpin's guilt or might simply have mistakenly thought that Turpin intended no harm when in fact she did intend the death of her husband. But a reasonable jury hearing the statement or Brown's testimony could conclude that Brown was telling the truth. The factors suggesting fabrication—possible attempts to curry favor with the police and Brown's friendship with Turpin—are factors that juries are perfectly capable of evaluating. *See* Peter W. Tague, *The Fifth Amendment: If an Aid to the Guilty Defendant, an Impediment to the Innocent One*, 78 Geo.L.Rev. 1, 41 (1989). I agree that in other cases these factors might support a decision to exclude the evidence. But in other cases, such evidence is not vital to the jury's attempts to ascertain the truth.

### D. *Summary*

I am not, as the majority suggests, merely motivated by a feeling that it would have been wiser for the trial judge to let the jury determine the exculpatory value and reliability of Brown's testimony or statement—although I think that this unquestionably would have been the better course to take. Instead, I am motivated by the firm conviction that the Fourteenth Amendment's Due Process Clause gives criminal defendants the right to a jury trial and that the right to a jury trial includes the right to have the jury

---

**11.** The majority states that Brown's statement likely would be inadmissible if it were offered in a separate trial of Turpin. *Supra*, n. 11 (citing *Taylor v. Commonwealth*, 821 S.W.2d 72, 75 (Ky. 1991) (noting that every material detail of an admitted out-of-court statement was corroborated "by independent testimony and physical evidence"), *cert. denied*, — U.S. —, 112 S.Ct. 1243, 117 L.Ed.2d 475 (1992)). Whether the statement would have been admissible under the rules of evidence is not the question here. The question here is whether excluding the exculpatory statement violated Turpin's constitutional rights. The majority's conclusion—that Brown's statement, even if exculpatory, could have been excluded as hearsay in a separate trial—erroneously assumes that a criminal defendant's constitutional right to present exculpatory evidence is coextensive with Kentucky Rule of Evidence 804(b)(3) or its federal counterpart, Fed.R.Evid. 804(b)(3). That is, the majority assumes that the Rule 804(b)(3) embraces the minimum requirements of the due process clause. This assumption flies in the face of *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297

(1973), and its progeny. It is worth noting, for example, that the exculpatory evidence originally excluded by the state court in *Chambers* would not have met the requirements set out in Rule 804(b)(3). The statement-against-penal-interest exception to the hearsay rule only applies when the declarant is unavailable. The declarant in *Chambers* actually was available and *did* in fact testify.

I agree with the majority that the Kentucky Supreme Court in *Taylor* only admitted a statement under Rule 804(b)(3) because "[e]very material detail of [the statement] was corroborated by independent testimony and physical evidence." *Id.* at 75. There, however, the *Commonwealth* was attempting to introduce hearsay against a criminal defendant. A heightened requirement of truthfulness was appropriate in that situation to protect the criminal defendant's rights under the confrontation clause of the U.S. Constitution. Requiring that "[e]very material detail" be corroborated when a criminal defendant attempts to introduce exculpatory evidence violates the defendant's due process rights.

have all available exculpatory material before it to assist in its task of determining the truth. Turpin was denied that right.

## III. *The Character Evidence*

As noted previously, the success of the Commonwealth's case against Turpin hinged on convincing the jury both that Turpin could manipulate others into killing Michael and that she actually did manipulate Bouchard and Brown into committing this crime. The task of showing that Turpin was a manipulative person was facilitated when the trial court admitted into evidence an excerpt from Turpin's teenage diary. The majority finds that the diary excerpt was properly admitted as evidence of Turpin's motive, because it "plainly displayed Turpin's longings for wealth." *Supra.* I find this argument hard to swallow; many, if not all of us, are motivated in part by a desire to be rich. Asserting that these teenage ramblings were introduced to show motive is either extremely naive or extremely cynical. As I show below, this evidence was introduced, and used repeatedly, to show that Turpin was a manipulative person who would use "crappy low-lives" she could "wrap around [her] finger" to achieve her ends.

The Commonwealth does not contest Turpin's claim that the diary entry was improperly admitted as character evidence. The majority nonetheless asserts that the Kentucky Supreme Court decided that these writings were properly admitted to prove intent or state of mind in *Turpin v. Commonwealth,* 780 S.W.2d 619 (Ky.1989), *cert. denied,* 494 U.S. 1058, 110 S.Ct. 1530, 108 L.Ed.2d 769 (1990).[12] The fact is, however, that the Kentucky Supreme Court's holding on this precise point was far from clear. At one point, it stated: "Evidence of the state of mind of the defendant and her relationship with her husband was admissible to show state of mind. The letter and the diary serve that purpose. It is not improper to show

even the commission of other crimes by a defendant if such evidence is relevant to the issue of motive, intent or state of mind." *Turpin,* 780 S.W.2d at 620. However, the court then equivocates: "In any event the alleged error was harmless and did not affect the substantial rights of the defendant. Considering the whole case there is no substantial possibility that the result would have been any different." *Id.* (citation omitted). Given this unclear statement from the Commonwealth's highest authority, it is arguable that admitting the diary entry as evidence of motive or state of mind could be considered an error in the application of state evidence law "which result[ed] in a denial of fundamental fairness [and] will support relief in habeas corpus." *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), *cert. denied, Marshall v. Walker,* 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983). That was the magistrate judge's position; he claimed that the diary entry and the letter that Turpin sent to her husband were written too remotely in time, and were so dissimilar to her present case that their probative value was substantially outweighed by the risk of prejudice. In particular, the diary entry only makes general reference to Turpin's ability to manipulate people but nowhere states that she actually had manipulated people or that she desired to manipulate people to commit criminal acts.

Still, as the Commonwealth admitted at oral argument, the real reason for admitting this evidence was not to show state of mind, but to show Turpin's character and that this was error under Kentucky law.[13] Although the Kentucky Supreme Court did not address this use of the evidence, it is well established that character evidence is inadmissible under both Kentucky and federal law.

As I noted above, the Commonwealth does not actually contest that admitting these statements was error. Instead, it maintains

**12.** The majority states that it agrees with the Kentucky Supreme Court's analysis. Strictly speaking, whether the majority agrees with the Kentucky Supreme Court should be irrelevant. That court is the highest authority on Kentucky law and its interpretations of Kentucky evidence rules should be authoritative—so long as those

interpretations do not conflict with federal constitutional protections.

**13.** The majority dismisses this admission. I find this peculiar, especially in light of the Kentucky Supreme Court's unclear holding on this point.

that the evidence against Turpin was overwhelming and that the error, therefore, was harmless.

This argument overstates the Commonwealth's case against Turpin. As discussed at length in Part II.A., *supra*, without Brown's statement, this, for all practical purposes, was a case of Turpin's word against Bouchard's. To find Turpin guilty of murder, the jury had to believe that Bouchard was telling the truth and that Turpin was lying.

The Commonwealth's harmless error argument also understates the actual harm that admitting this evidence had to Turpin's chances to mount a defense. To reach its conclusion that Turpin was guilty, the jury had to find that Turpin was the sort of person who would and could manipulate Bouchard and Brown to commit a murder on her behalf. To achieve this end, the prosecutor repeatedly and effectively confronted Turpin with portions of the diary entry during his cross-examination. For example, the prosecutor asked Turpin whether she considered her hometown friends "crappy low-lifes," (Turpin testimony, Tr. Vol. XVIII at 31), whether Bouchard was "one of those crappy low-lives that [she could] wrap around her finger," (Turpin testimony, Tr. Vol. XVIII at 55; *see also* Tr. Vol. XVIII at 70, 100, 105), whether she could name any other people she could "wrap around her finger," (Turpin testimony, Tr. Vol. XVIII at 55), whether Michael's murder was "a challenge to be overcome by [her] 'devious means,'" (Turpin testimony, Tr. Vol. XVIII at 94, quoting from Turpin's diary), whether Brown was "one of those crappy low-lives that [she could] use and throw away," (Turpin testimony, Tr. Vol. XVIII at 96; *see also* Tr. Vol. XVIII at 100, 105), whether she was a manipulative person, (Turpin testimony, Tr. Vol. XVIII at 105), whether she had manipulated Michael, (*id.*), and whether she now was attempting to manipulate the jury, (*id.*).

Without this evidence, the Commonwealth would have had to find some other way to convince the jury that Turpin was willing and able to manipulate Bouchard into killing her

husband. Of course, the strongest evidence that Turpin actually manipulated the others is the fact that Bouchard actually killed Michael—despite having little motive to do so.[14] That is Bouchard's story. But as I noted above, it also is entirely possible that Bouchard misunderstood Turpin's wishes. The use of character evidence showing that Turpin was manipulative was harmful here because it directly counters Turpin's contention that she never intended to exploit Bouchard to kill Michael. The harm is compounded because the only evidence supporting Turpin's version of the events—Brown's testimony or statement—was excluded from the joint trial.

## IV. *Turpin's cross-appeal*

I agree with the majority that Turpin's four cross-appeal issues are without merit.

## V. *Conclusion*

I cannot accept either the reasoning or the result in Parts II and III of the majority's opinion. The majority has emasculated the constitutional right to trial by jury and has made technical rules a substitute for the right that an accused person has to present vital exculpatory evidence to a jury. It also has permitted a jury to return its verdict based on Turpin's character and not on her actions. I cannot understand why this court has done so. Perhaps, as Chief Judge Merritt wrote recently, "In our zest to incarcerate, we are in danger of losing the rule of law." *United States v. Rugiero*, 20 F.3d 1387, 1395 (6th Cir.1994) (Merritt, C.J., dissenting).

Our judiciary and our cases have stood steadfastly for the principle that a person accused of a crime has the right to present exculpatory evidence. Our process has long required prosecutors to divulge to an accused defendant any evidence or information that indicates non-guilt so that it can be presented to a jury. The strength of our judicial system has been its unyielding steadfastness to require the state to prove guilt. Its strength has been to require the state to allow an accused person, even though seem-

---

14. Bouchard testified, for example, that although Brown offered him money, he never actually expected to get any money for murdering Michael. (Bouchard testimony, Tr. Vol. XII at 122).

ingly guilty, or even overwhelmingly seemingly guilty, to submit exculpatory evidence which might indicate non-guilt.

Equally fundamental in our system of justice is the principle that a criminal defendant is to be judged by what he or she has done and not by who he or she is.

In this case we move away from these principles.